**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GAVIN M. CHEN and SARA J. LEE,

      Plaintiffs,

         v.

JEWELL BELL-SMITH,
DARRYL A. SMITH,
EK SETTLEMENTS, INC., SANDY KIM,
OCWEN LOAN SERVICING, and
HSBC BANK USA, N.A.,

      Defendants.

Civil Action No.  08-0999 (JDB)

## MEMORANDUM OPINION

Plaintiffs Sara Lee and Gavin Chen (collectively, "plaintiffs") bring this action against

defendants Jewell Bell-Smith, Darryl Smith, EK Settlements, Inc., Sandy Kim, Ocwen Loan

Servicing, and HSBC Bank USA, N.A., asserting various claims arising from an allegedly

fraudulent mortgage foreclosure rescue scheme orchestrated by a woman named Carline Charles.

Plaintiffs maintain that in late 2005, Charles -- purporting to act on behalf of a company named

"C&O Property Solutions" -- approached them about a mortgage refinancing program by which

they could avoid foreclosure of their home at 5011 14th St., NW, Washington DC.  Plaintiffs

agreed to participate in the program, and signed several documents provided to them by Charles,

including (allegedly unbeknownst to them) a deed of sale dated December 28, 2005, which

transferred title to their home to defendants Bell-Smith and Smith ("the Smiths") for $425,000.

The Smiths financed their purchase of plaintiffs' home with two loans that they obtained

from Pinnacle Financial Corporation, which were secured by deeds of trust in the property.  The

beneficial interest in the loans has since been assigned to HSBC Bank ("HSBC"), while the servicing obligation on the loans has been assigned to Ocwen Loan Servicing ("Ocwen"). EK Settlements oversaw the "sale" and prepared a HUD-1 settlement statement, which plaintiffs and the Smiths signed, and which indicates that the $425,000 purchase price was used to satisfy two existing loans on the property and several mysterious charges -- *i.e.*, a "security escrow" fee, a "property management" fee, and a "consultant" fee. Plaintiffs received $32,119.76 from the transaction, which they continued to believe was a mortgage refinancing until 2007, when Bell-Smith contacted Lee to inform her that the Smiths were, in fact, the owners of plaintiffs' home.

Plaintiffs filed this suit on June 11, 2008, alleging fraud (Count 1), violations of the D.C. Consumer Protection Procedures Act (Count 2), the D.C. Loan Shark Act (Count 3), the D.C. Interest and Usury Law (Count 4), the D.C. Consumer Credit Service Organization Act (Count 5), and the Real Estate Settlement and Procedures Act (Count 6), as well as breach of fiduciary duty (Count 7), conversion (Count 8), injurious falsehood, disparagement, and slander of title (Count 9), unjust enrichment (Count 10), breach of contract (Count 11), and negligence (Count 12). Plaintiffs seek to quiet title (Count 17), and request a declaratory judgment voiding the deed of sale (Count 13), as well as $425,000 in actual damages and $1.275 million in punitive damages. The Smiths have counter-claimed for unjust enrichment and declaratory relief, and also seek $425,000 in damages. Presently before the Court are the motions for summary judgment filed by the Smiths, see Smiths' Mot. for Summ. J. ("Smiths' Mot.") [Docket Entry 68] and by HSBC and Ocwen, see Defs.' Ocwen and HSBC's Renewed Mot. for Summ. J. ("HSBC Mot.") [Docket Entry 72]. For the reasons explained below, the Court will grant in part and deny in part the Smiths' motion, and grant the motion filed by HSBC and Ocwen.

**BACKGROUND**

**I.     The Alleged Fraudulent Mortgage Foreclosure Rescue Program**

Plaintiffs Lee and Chen are both college-educated, and they both have master's degrees, in social work and economics, respectively.  See Pls.' Opp. to Smiths' Mot. for Summ. J. ("Pls.' Opp.") [Docket Entry 73], Ex. 8 ("Lee's Resp. to Interrog.") no. 3; see also Reply Mem. in Supp. of Defs.' Ocwen and HSBC's Renewed Mot. for Summ. J. ("HSBC Reply Mem.") [Docket Entry 77], Ex. 9 ("Reply Chen Dep.") at 18-19.  In late 2005, plaintiffs were facing foreclosure of their home at 5011 14th St., NW, Washington, DC.  2nd Am. Compl. ¶ 6.  At the time, they had a mortgage of $172,040.59, and an additional lien on the property in the amount of $65,224.09. See Pls.' Opp., Ex. 3 ("HUD-1 Statement").  Carline Charles, an alleged representative of C&O Property Solutions, approached plaintiffs and explained that she could help them refinance their mortgage to avoid foreclosure.  2nd Am. Compl. ¶ 8.  Specifically, Charles proposed that plaintiffs enter into a mortgage refinancing program whereby C&O Property Solutions would "hold title to the property for six months, [and] then transfer it back to the Plaintiffs."  Id. ¶ 4. During this time, plaintiffs could "rebuild their credit, [and] pay the monthly mortgage" via checks made payable to C&O Property Solutions.  Id. ¶ 8; see also Pls.' Opp., Ex. 6 ("Lee Dep.") at 39-40, 121-124, 134-136.  After six months had elapsed and plaintiffs' credit had improved, plaintiffs could refinance their mortgage again, at which point the title to their home would be transferred back to them.  See 2nd Am. Compl. ¶ 8; see also Lee Dep. at 121-122.

Plaintiffs understood their arrangement with Charles to be a pure mortgage refinancing transaction, and never believed that they would be selling their home.  See Lee Dep. at 39-40; see also Pls.' Opp., Ex. 1 ("Lee Aff.") ¶ 7; id., Ex. 2 ("Chen Aff.") ¶ 3.  Indeed, Lee only agreed

-3-

to the transaction because she thought that her dealings with Charles would prevent her from

having to sell her home. <u>See</u> Lee Dep. at 122. Shortly after proposing the refinancing plan,

Charles came to plaintiffs' home and presented plaintiffs with some documents, which they

signed. 2nd Am. Compl. ¶ 9; <u>see also</u> HSBC Mot., Ex. 3 ("Defs.' Lee Dep.") at 47-48, 51; <u>id.</u>,

Ex. 1 ("Chen Dep.") at 39. Later, a representative from EK Settlements came to plaintiffs' home

with some additional documents for plaintiffs' signature. <u>See</u> Defs.' Lee Dep. at 52-54. Lee

maintains that when she signed the documents, no names were listed on them as purchasers of

her home, <u>see</u> Defs.' Lee Dep. at 45-49, 340; Chen also claims that the documents he signed were

at least partially blank, <u>see</u> Chen Dep. at 56, 87. Regardless, plaintiffs both allege that Charles

led them to believe the documents they signed were related to a mortgage refinancing -- not to a

sale of their home. <u>See</u> Lee Dep. at 31, 35-40; Chen Dep. at 38; Lee's Resp. to Interrog. no. 5.

In actuality, the documents that plaintiffs signed included a notarized "deed of sale" and a

HUD-1 settlement statement, both dated December 28, 2005, which transferred title to their

home to the Smiths for $425,000. <u>See</u> Pls.' Opp., Ex. 18 ("Deed of Sale"); HUD-1 Statement.[1]

At the time of the transaction, the property had an appraised value of $627,000. <u>See</u> Pls.' Opp.,

Ex. 4 ("Dec. 2005 Appraisal"). The settlement statement prepared by EK Settlements -- and

signed by plaintiffs and the Smiths -- indicates that the $425,000 purchase price was used to pay

(1) the existing $172,040.59 mortgage; (2) a $65,224.09 lien on the property to a company

---

[1] Significantly, plaintiffs do not allege that their signatures were forged on either the deed of sale or the HUD-1 settlement statement. <u>See, e.g.</u>, Chen Dep. at 58-60 (stating, with respect to the deed, "I'm not saying it was forged"); <u>id.</u> at 87 (explaining with respect to the settlement statement that "it looks like my signature"); Defs.' Lee Dep. at 341 (stating, in response to a question asking whether her signature was forged on any of the relevant documents, "I did not say that anyone forged my signature. I said it appeared to be my signature.").

identified as "Purdue, LLC"; (3) $23,063.69 in closing costs; and (4) a series of mysterious charges -- *i.e.*, a "security escrow" fee ($40,004.00), a "property management" fee ($45,996.00), and a "consultant" fee ($40,000.00).  See HUD-1 Statement.  The settlement statement also shows that the deal was brokered by a company called Mortgage Star, which commissioned the appraisal of the property.  See id.; see also Dec. 2005 Appraisal.  Finally, the settlement statement reflects a $32,119.79 cash payment to plaintiffs, which plaintiffs concede was made by C&O Property Solutions to Lee's checking account on January 3, 2006.  See Pls.' Opp., Ex. 13. This payment was consistent with Lee's understanding, based on her discussions with Charles and EK Settlements, that she would receive some money pursuant to the "refinancing" to pay her outstanding debts.  See Lee Dep. at 121; Defs.' Lee Dep. at 55-56.

The same day that Lee received that cash payment, plaintiffs received a letter from C&O Property Solutions welcoming them as "new customer[s]" and informing them that the first payment on their refinanced "mortgage loan," in the amount of $1,900, would be due on February 1, 2006.  See Pls.' Opp., Ex. 5 ("Welcome Letter").  The letter also explained that C&O Property Solutions would maintain an "escrow account" on plaintiffs' behalf, which would be used to pay their "taxes" and "insurance."  Id.  From January 2006 through August 2007, plaintiffs wrote C&O Property Solutions monthly $1,900 checks, which they believed were being applied to their newly-refinanced mortgage.  See Lee Dep. at 124, 134-35; see also Lee's Resp. to Interrog. no. 14.  After six months had passed, plaintiffs contacted Charles to inquire about the second refinancing of their mortgage, but Charles told plaintiffs that it was not the appropriate time to refinance.  2nd Am. Compl. ¶ 11.

In the spring of 2007, Charles' scheme began to unravel.  Lee started to have difficulty

reaching Charles, and she received several telephone messages from a woman identifying herself as Bell-Smith.  <u>See</u> Lee Dep. at 137-39, 145-47.  Lee did not know anyone by that name, but she eventually returned Bell-Smith's call after Charles advised her to do so.  <u>Id.</u>  At that point, Bell-Smith -- for the first time -- informed Lee that the Smiths were the owners of plaintiffs' home. 2nd Am. Compl. ¶ 12.[2]  Bell-Smith told Lee that C&O Property Solutions had ceased paying the mortgage on the property, and that Lee should make all future mortgage payments to Bell-Smith, or directly to the mortgage company.  <u>Id.</u>; <u>see also</u> Bell-Smith Decl. ¶ 15.  Shortly thereafter, plaintiffs began making monthly payments of approximately $1,900 to Bell-Smith, and they continued to do so through March 2008.  Bell-Smith Decl. ¶ 19; Lee's Resp. to Interrog. no. 16.[3]

From the date of the alleged "sale" through the filing of this suit, plaintiffs have lived at 5011 14th St., NW, Washington, DC, and they have never signed a lease with the Smiths.  <u>See</u> Pls.' Opp., Statement of Undisputed Facts ¶ 17; <u>see also</u> Smiths' Mot. at 7; 2nd Am. Compl. ¶ 99.

## II.     Defendants' Alleged Role in the Fraudulent Mortgage Foreclosure Rescue Program

The Smiths apparently purchased plaintiffs' home pursuant to an agreement they had with Charles and C&O Property Solutions, whereby the Smiths would act as "credit buyers," who would hold title to the property for one year only.  <u>See</u> Pls.' Opp., Ex. 9 ("Bell-Smith Dep.") at 87-88; <u>id.</u>, Ex. 10 ("Smiths' Resp. to Interrog.") no. 8; <u>id.</u>, Ex. 15 ("Charles/Bell-Smith 5/4/07 E-

---

[2] There is some discrepancy as to the precise timing of Lee's first communication with Bell-Smith.  Bell-Smith recalls that she first spoke to Lee in May 2007, while Lee maintains that she did not speak to Bell-Smith until August 2007.  <u>Compare</u> Smiths' Mot., Ex. 11 ("Bell-Smith Decl.") ¶ 15 <u>with</u> Lee's Resp. to Interrog. no. 6.

[3] There is another discrepancy as to the precise timing of Lee's first mortgage payment to Bell-Smith.  Bell-Smith states that plaintiff first paid her $1,900 in July 2007, while Lee claims that she did not begin sending mortgage payments to Bell-Smith until September 2007. <u>Compare</u> Bell-Smith Decl. ¶ 19 <u>with</u> Lee's Resp. to Interrog. no. 16.

mail").  On December 28, 2005, a representative from EK Settlements came to the Smiths' home

with documents for the closing, which already had plaintiffs' names written on them.  Bell-Smith

Decl. ¶¶ 5-6.  Bell-Smith recalls that she met with the EK Settlements agent for less than thirty

minutes, and had no subsequent interaction with him after signing the closing documents.  Id. ¶

8.  In January 2006, Charles paid Bell-Smith $10,000 for her "credit buying" services, and told

her that she would receive additional funds from a $30,000 escrow account in a year, once the

property had been sold back to plaintiffs.  See Bell-Smith Dep. at 87-88, 239; Smiths' Resp. to

Interrog. nos. 6, 8; Charles/Bell-Smith 5/4/07 E-mail; Pls.' Opp., Ex. 17.

Bell-Smith made other, similar "investments" with Charles around the same time,

agreeing to serve as a "credit buyer" for another property in Owings Mills, Maryland the same

month that she and her husband purchased plaintiffs' home.  See Smiths' Resp. to Interrog. no.

22.  Prior to entering into these "investments" with Charles, Bell-Smith had been trained and

certified as a mortgage loan processor, and did some work for Mortgage USA -- a branch of

Mortgage Star, the company that brokered the sale of plaintiffs' home.  See Bell-Smith Dep. at

14, 24-25; Smiths' Resp. to Interrog. no. 4.

The Smiths financed their purchase of plaintiffs' home with two notes that they obtained

from Pinnacle Financial Corporation, in the amounts of $340,000 and $85,000, which were

secured by deeds of trust in the property.  See Smiths' Mot., Exs. 2-3, 6-7.  The former note had

an adjustable interest rate and a monthly payment of $2,125.00, while the latter had a fixed

interest rate of 11.875% and a monthly payment of $866.15.  Id., Exs. 2-3.  When they obtained

the notes, the Smiths fraudulently represented to Pinnacle Financial Corporation that they

intended to occupy plaintiffs' home as their "primary residence."  See Pls.' Opp., Ex. 20.

Charles allegedly assured the Smiths that they would not be responsible for making any payments on the notes -- even though the notes were in their name -- and that C&O Property Solutions would make the payments through funds "provided by an 'investor.'" <u>See</u> Smiths' Resp. to Interrog. no. 13-14. Charles did not tell the Smiths the identity of this "investor," nor did the Smiths ask Charles where the money would be coming from. <u>See</u> Bell-Smith Dep. at 87, 239. Then, in April 2007, Charles informed the Smiths that C&O Property Solutions would no longer be making payments on the notes, and that neither she nor her company had any further obligations regarding the property. <u>See</u> Smiths' Resp. to Interrog. no. 13-14. At that point, Bell-Smith became concerned as to the effect that non-payment would have on her credit score, and she e-mailed Charles, telling her that she wanted the property transferred out of her name immediately. Pls.' Opp., Ex. 15 ("Charles/Bell-Smith 5/1/07 E-mail"). Bell-Smith e-mailed Charles again on May 4, 2007, writing: "I had an agreement with C&O Property Solutions to be [a] [c]redit buyer for 1 year and 1 year only . . . I want my money TODAY!!!! I don't live at 14th Street . . . and I should not have to pay for [it]. If you took Ms. Lee's money and spent it, you need to replace it not me." <u>See</u> Charles/Bell-Smith 5/4/07 E-mail. Bell-Smith wrote to Charles a few weeks later, telling her, "[y]ou are worse than the people you talk about, you call them hustlers and say they treat it like a hustle, so what are [you]????" Pls.' Opp., Ex. 15 ("Charles/Bell-Smith 5/21/07 E-mail"). Shortly after sending this e-mail, Bell-Smith contacted Lee, and informed her of the situation. <u>See</u> Bell-Smith Decl. ¶ 15; Lee's Resp. to Interrog. no. 6.

Lee then began paying approximately $1,900 per month toward the notes, while the Smiths paid the balance of approximately $1,300 per month. <u>See</u> Smiths' Resp. to Interrog. no.

10.[4]  At one point, the Smiths' attorney wrote to plaintiffs, and tried to convince them to either increase what he characterized as their "monthly rent payment," or agree to purchase the property from the Smiths for $525,000.  See Pls.' Opp., Ex. 19.  Plaintiffs were not receptive to either option, and stopped making payments to the Smiths altogether in March 2008.  See Smiths' Resp. to Interrog. no. 10; Bell-Smith Decl. ¶ 19; Lee's Resp. to Interrog. no. 16.  Bell-Smith maintains that from May 2007 through February 2008, she and her husband paid approximately $15,931.00 on the two notes.  Bell-Smith Decl. ¶ 18.[5]  The record does not specify the total amount currently due under the two notes, nor does it specify whether plaintiffs or the Smiths have made any payments on the notes since 2008, and if so, in what amounts.

In April 2006, Ocwen was assigned the servicing obligation on the two notes.  See HSBC Mot., Ex. 8 ("Jones Aff.") ¶ 5.  As a servicing agent, Ocwen "does not hold the beneficial interest in notes, deeds of trust, or the right of payments on said notes"; rather, it is merely responsible for collecting payments "on behalf of certain lenders and investors with which it contracts."  Id. ¶ 4.  In May 2006, Mortgage Electronic Recovery Systems, as nominee for Pinnacle Financial Corporation, assigned the beneficial interest in the notes and the deeds of trust to Nomura Credit and Capital, Inc., which assigned its interest to HSBC -- the current interest-holder -- in August

---

[4] The total monthly payment initially due under the two notes was $2,991.15. See Smiths' Mot., Exs. 2-3.  The estimated monthly payment made by plaintiffs and the Smiths ($3,200) exceeds this amount.  Presumably, this discrepancy is explained by the fact that the $340,000 note had an adjustable interest rate, see id. Ex. 2, and hence, the monthly amount due under the note had likely increased by the time that plaintiffs began making payments.

[5] Bell-Smith declares that "[t]he total paid by Darryl Smith and I from May 2007 through February 2007 under the First and Second Notes was approximately Fifteen Thousand Nine Hundred Thirty-One Dollars ($15,931.00)."  Bell-Smith Decl. ¶ 18 (emphasis added).  The Court assumes the reference to February 2007 was a typographical error, and that Bell-Smith intended to state that she and her husband paid $15,931.00 between May 2007 and February 2008.

2006. Id. ¶ 6. HSBC and Ocwen allege, and plaintiffs do not dispute, that "[p]rior to being assigned its respective interests in the . . . Notes and Deeds of Trust, neither HSBC or Ocwen had any knowledge or notice of the facts alleged in the Second Amended Complaint." Id. ¶ 16.

## III.    Procedural History

Plaintiffs initially filed this action in D.C. Superior Court, naming the Smiths, EK Settlements, Charles, C&O Property Solutions, Pinnacle Financial Corporation, and Mortgage Star as defendants. See Notice of Removal [Docket Entry 1]. Mortgage Star removed the case to this Court on the basis of diversity jurisdiction, and filed a motion to dismiss all claims against it, see Mortgage Star Mot. to Dismiss [Docket Entry 33], which the Court granted as conceded when plaintiffs failed to timely respond, see 11/7/08 Minute Order.[6] Plaintiffs have since twice amended their complaint, such that all claims are now raised only against the Smiths, EK Settlements, its president Sandy Kim, Ocwen, and HSBC. See 2nd Am. Compl.[7] The Smiths have filed two counter-claims against plaintiffs, asserting unjust enrichment and a claim for a declaratory judgment that they are the lawful owners of the property. See Smiths' Answer ("Answer") [Docket Entry 21]. Although the alleged wrongdoing by Charles and C&O Property Solutions still lies at the heart of plaintiffs' Second Amended Complaint, see, e.g., 2nd Am. Compl. ¶¶ 8, 11, 14, neither Charles nor C&O Property Solutions is currently named as a defendant in this suit.

Counsel for EK Settlements and Sandy Kim withdrew in December 2008. See Mot. to

_____

[6] The case was originally assigned to Judge Robertson, but was reassigned to the undersigned Judge on June 3, 2010 when Judge Robertson retired from the federal bench.

[7] Plaintiffs' Second Amended Complaint contains Counts 1 through 13 and 17, but omits Counts 14 through 16.

Withdraw [Docket Entry 44]; see also 12/10/2008 Minute Order. At that time, counsel represented to the Court that Kim "was shutting down EK Settlements," that the company was insolvent, and that it did not have any insurance coverage. See Mot. to Withdraw. Since their attorneys' withdrawal, Kim and EK Settlements have been totally unresponsive parties. However, plaintiffs have neither amended their complaint to omit Kim and EK Settlements as defendants, nor have they sought a default judgment against them.

In March 2009, HSBC filed a motion to dismiss all counts against it except Count 13 (declaratory judgment) and Count 17 (quiet title). See HSBC Mot. to Dismiss [Docket Entry 51]. In August 2009, HSBC and Ocwen filed a motion for summary judgment on all claims, see HSBC Mot. for Summ. J. [Docket Entry 58], as did the Smiths, who sought summary judgment on plaintiffs' twelve claims against them as well as on their two counter-claims against plaintiffs, see Smiths' Mot. for Summ. J. [Docket Entry 57]. On November 12, 2009, Judge Robertson granted HSBC's motion to dismiss all counts against it except Count 13 (declaratory judgment) and Count 17 (quiet title), but denied both sets of defendants' motions for summary judgment. See Mem. Order [Docket Entry 64] at 4-5. In denying summary judgment to HSBC and Ocwen, the Court explained that denial was necessary, "if only because, until or unless we are able to sort out who is the proper owner of the property and who owes what to whom, they are necessary parties." Id. at 5. With respect to the Smiths, the Court found that summary judgment would also be improper, given the "many unanswered questions in this record" and the fact that plaintiffs "have not yet had the discovery that might fill some of the gaps in the record." Id.

After the completion of discovery, plaintiffs voluntarily dismissed all claims against HSBC and Ocwen except Count 13 (declaratory judgment). See 4/20/10 Minute Entry. Now

before the Court are the post-discovery, renewed motions for summary judgment filed by the Smiths and by HSBC and Ocwen. HSBC and Ocwen seek summary judgment on plaintiffs' only remaining claim against them, while the Smiths seek summary judgment on all twelve of plaintiffs' claims against them -- that is, their claims alleging fraud (Count 1), violations of the D.C. Consumer Protection Procedures Act (Count 2), the D.C. Loan Shark Act (Count 3), the D.C. Interest and Usury Law (Count 4), the D.C. Consumer Credit Service Organization Act (Count 5), and the Real Estate Settlement and Procedures Act (Count 6), as well as their common law claims for conversion (Count 8), injurious falsehood, disparagement, and slander of title (Count 9), unjust enrichment (Count 10), and breach of contract (Count 11), and, finally, plaintiffs' quiet title claim (Count 17) and request for a declaratory judgment (Count 13). The Smiths have also moved for summary judgment with respect to their counter-claims against plaintiffs for unjust enrichment and declaratory relief, in which they seek $425,000 in damages.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1);

see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## DISCUSSION

### I.     HSBC and Ocwen

HSBC and Ocwen both seek summary judgment on Count 13 of plaintiffs' Second Amended Complaint, in which plaintiffs request a declaratory judgment setting forth "their rights and responsibilities under the contracts between the parties." 2nd Am. Compl. ¶ 97. Specifically, plaintiffs demand that the December 28, 2005 deed of sale "be declared null and void"; that the "$425,000 Deed of Trust liens on the Plaintiffs' property be declared null and void"; and that the Court enter a judgment "vesting the subject real property title in the sole name of the Plaintiff Gavin M. Chen and Sara J. Lee." Id. HSBC has moved for summary judgment on the ground that it is a bona fide purchaser for value, and as such, its interests in the property are valid and enforceable even if the Smiths obtained title to the property by fraud.

Ocwen argues that summary judgment should be entered in its favor because it does not hold any beneficial interest in the property, and therefore, it "has no ability to independently comply with any declaratory judgment with respect to title."  See HSBC Mot. at 15.

Ocwen is correct that it is not a proper defendant in plaintiffs' declaratory judgment action.  Ocwen is merely the servicing agent for the two notes; it does not hold the beneficial interest in the notes or deeds of trust, nor does it possess the right to payment on the notes.  Jones Aff. ¶ 4.  Plaintiffs mistakenly assert that Ocwen is a necessary party because "there is a fierce dispute about how the deed, currently held by HSBC and Ocwen, was obtained."  See Pls.' Opp. to HSBC Mot. [Docket Entry 74] at 10.  But again, the deeds of trust belong only to HSBC, not to Ocwen.  Because Ocwen does not possess any beneficial interest in the notes or deeds of trust, it "cannot afford Plaintiffs the declaratory relief they seek."  HSBC Mot. at 15.  Hence, Ocwen's motion for summary judgment will be granted.

Whether HSBC is entitled to summary judgment presents a more complicated question, as it depends both on the nature of the alleged fraudulent transaction between plaintiffs and the Smiths, and on whether HSBC can be considered a bona fide purchaser for value.  A bona fide purchaser is "one who 'acquire[d] . . . interest in a property for valuable consideration and without notice of any outstanding claims which are held against the property by third parties.'" Smith v. Wells Fargo Bank, 991 A.2d 20, 26 (D.C. 2010) (quoting Clay Props., Inc. v. Wash. Post Co., 604 A.2d 890, 894 (D.C. 1992)).  A bona fide purchaser is "protected from outstanding interests in the property of which it had no notice," see Smith, 991 A.2d at 26, and hence a bona fide purchaser "may obtain a valid interest in real property from someone who obtained that property by fraud," so long as the bona fide purchaser "had no notice of the fraud."  Haley v.

Corcoran, 659 F. Supp. 2d 714, 722 (D. Md. 2009) (citing Wicklein v. Kidd, 131 A.2d 780, 783 (Md. 1926)).[8] Courts in the District of Columbia have held that "deed of trust holders" like HSBC are "on the same legal footing as bona fide purchasers in matters involving title to real property" when they "take an interest in real property in exchange for value and without notice of an outstanding claim." Assocs. Fin. Servs. of Am., Inc. v. Dist. of Columbia, 689 A.2d 1217, 1221-22 (D.C. 1997) (citing Osin v. Johnson, 243 F.2d 653, 657 (D.C. Cir. 1957)).

However, HSBC cannot be afforded the protections available to bona fide purchasers if the alleged fraudulent conveyance of the property from plaintiffs to the Smiths was "void ab initio." See Smith, 991 A.2d at 26. In contrast to a voidable contract -- which "may be avoided or confirmed," but is not "absolutely void and of no effect" -- a contract that is void ab initio is "null from the beginning and nothing can cure it." Julian v. Buonassissi, 963 A.2d 234, 244 (Md. Ct. Spec. App. 2009), *vacated on other grounds*, 997 A.2d 104 (Md. 2010). This distinction is significant for purposes of determining the rights of bona fide purchasers, for while a "voidable deed is 'unassailable in the hands of a bona fide purchaser,' the 'protections afforded to bona fide purchasers do not apply to deeds that are void.'" Smith, 991 A.2d at 26 (quoting SEC v. Madison Real Estate Group, LLC, 647 F. Supp. 2d 1271, 1279 (D. Utah 2009)).

Before assessing whether HSBC constitutes a bona fide purchaser, then, this Court first

---

[8] Because the District of Columbia "derives its common law from the state of Maryland," courts applying D.C. law may look to Maryland law when there is no controlling D.C. authority directly on point. Johnson v. Fairfax Vill. Condo. IV Unit Owners Ass'n, 641 A.2d 495, 507 n.22 (D.C. 1994); see also Hill v. Md. Cas. Co., 620 A.2d 1336, 1337 n.3 (D.C. 1993) (quoting Walker v. Indep. Fed. Sav. & Loan Ass'n, 555 A.2d 1019, 1022 (D.C. 1989)) (explaining that "when 'there are no District cases squarely on point, . . . [and] [i]n the absence of appellate or other authority in this jurisdiction,' this court may give Maryland law special attention because the District 'was carved out of Maryland and derives its common law from that state'").

must determine whether the deed by which plaintiffs transferred title to their property to the Smiths was void ab initio.  Forged deeds are void ab initio, see, e.g., M.M. & G., Inc. v. Jackson, 612 A.2d 186, 191 (D.C. 1992) ("It is well settled that a forged deed cannot validly transfer property and that even a bona fide purchaser takes nothing from that conveyance"); Julian, 997 A.2d at 120 (quoting Harding v. Ja Laur Corp., 315 A.2d 132, 135 (D.C. 1974)) ("A forged deed . . . is void *ab initio*"), but plaintiffs have conceded that their signatures were not forged on the December 28, 2005 deed of sale.  See n.1 supra.  A non-forged deed may, however, still be considered void ab initio if it was obtained via "fraud in the factum," defined as "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents."  See Langley v. FDIC, 484 U.S. 86, 93-94 (1987); see also Meyers v. Murphy, 28 A.2d 861, 862 (Md. 1942) (explaining that fraud in the factum arises "from the want of identity or disparity between the instrument executed and the one intended to be executed").  Plaintiffs appear to have raised a fraud in the factum defense here, by arguing that they did "not know the nature, extent, or character of the transaction [they] entered into because it was entirely fraudulent and they were in desperate need."  See Pls.' Opp. at 10.

Successful invocations of the fraud in the factum defense are rare, and "only in the most extreme situations have courts of any jurisdiction found a fraud in the factum defense to be viable."  Brown v. Carlson, 2009 WL 2914191, at *4-5 (Mass. Super. Ct. Sept. 1, 2009).  For example, the D.C. Circuit in Holmes v. Jones found a deed void ab initio where a woman over eighty years old "had not been properly informed and did not realize that the documents she signed were conveyances of her property."  343 F.2d 301, 302 (D.C. Cir. 1965).  In so holding, the court distinguished the case from its earlier decision in Osin v. Johnson, "where a

conveyance of property by 'a woman of more than average business experience' induced by the buyer's misrepresentations was held voidable rather than void so that subsequent trust deeds conveyed to bona fide purchasers were valid." Id. at 302 n.1 (quoting Osin, 243 F.2d at 654).

Significantly, courts will not find fraud in the factum "when the signer is capable of reading and understanding the content of the document" and simply fails to do so. Brown, 2009 WL 2914191, at *4 (internal quotation marks and citations omitted); see also Columbia Fed. Sav. & Loan Ass'n v. Jackson, 131 A.2d 404, 408 (D.C. 1957) (explaining that a plaintiff may be estopped from raising a fraud in the factum defense "if as a literate and reasonably intelligent person he fails to read the instrument"). Rather, the party asserting fraud in the factum must show that "her ignorance was 'excusable' due to her having had 'no reasonable opportunity to obtain knowledge' about the true nature of the document before signing it." Brown, 2009 WL 2914191, at *4 (internal citation omitted); see also comment to D.C. Code § 28:3-305(a)(1)(iii) (explaining in the context of negotiable instruments that a party seeking to prove fraud in the factum "must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge" as to the true nature of the instrument). In determining whether a party had such a "reasonable opportunity," courts consider a number of factors, including the party's "'age, intelligence, education and business experience, ability to read and to understand English, reasons to rely on the representations or to have confidence in the party making them, and the apparent necessity for acting swiftly.'" Brown, 2009 WL 2914191, at *4 (quoting FDIC v. Rusconi, 808 F. Supp. 30, 40 (D. Me. 1992)); see also comment to D.C. Code § 28:3-305(a)(1)(iii); FDIC v. Va. Crossings P'ship, 909 F.2d 306, 311 (8th Cir. 1990).

In Brown -- a case involving a fraudulent mortgage foreclosure rescue scheme similar to

this one -- the plaintiff, "widowed and in her sixties, with an eighth grade education," was fraudulently induced to sign a quitclaim deed transferring title to her home to a woman who represented that she would "take care of the mortgage, and that once [the plaintiff] got back on her feet the house would be hers again."  2009 WL 2914191, at *1.  When the plaintiff realized that she had been defrauded out of her home, she brought suit, alleging that the deed she signed was void ab initio on account of fraud in the factum.  The court, while acknowledging that the plaintiff was perhaps "more susceptible" to misrepresentations due to her "financial insecurity and anxieties about losing her home," nonetheless held that the plaintiff had "failed to create a triable issue as to fraud in the factum," given that she was an English speaker who could read, and "had a reasonable opportunity to examine and seek help in understanding [the deed's] contents."  Id. at *6; see also Cash v. Titan Fin. Servs., Inc., 873 N.Y.S. 2d 642, 645 (N.Y. App. Div. 2009) (rejecting fraud in the factum claim where plaintiff had an eleventh grade education, could read and write, "was neither prevented from reading the closing documents, nor told not to read them," but "nonetheless signed all of the closing documents without reading them").

Plaintiffs in this case are both college-educated, and both hold master's degrees. See Lee's Resp. to Interrog. no. 3; see also Reply Chen Dep. at 18-19.  Indeed, plaintiff Chen holds a master's degree in economics, and currently teaches entrepreneurial finance.  See Reply Chen Dep. at 11-12, 18-19.  There is thus no dispute that plaintiffs were fully capable of reading and understanding the deed of sale and the HUD-1 settlement statement, if they had taken the time to do so.  Yet plaintiffs chose to sign these documents without reading them, instead relying "solely on the representations of a woman whom [they] had never met."  Brown, 2009 WL 2914191, at *6.  Because plaintiffs are both "literate and reasonably intelligent" persons who

simply failed to read the documents they were signing, they cannot establish a viable claim of fraud in the factum.  <u>See</u> <u>Columbia Fed. Sav. & Loan Ass'n</u>, 131 A.2d at 408.

At most, then, plaintiffs have stated a claim of fraud in the inducement, which would only render the deed of sale voidable, not void.  Because a voidable deed "is 'unassailable in the hands of a bona fide purchaser,'" <u>Smith</u>, 991 A.2d at 26 (quoting <u>Madison Real Estate Group, LLC</u>, 647 F. Supp. 2d at 1279), the question becomes whether HSBC was a bona fide purchaser, who "'acquire[d] an interest in a property for a valuable consideration and without notice of any outstanding claims which are held against the property by third parties.'"  <u>Clay Props., Inc.</u>, 604 A.2d at 894.  It is undisputed that Pinnacle Financial Corporation -- HSBC's predecessor-in-interest -- acquired its interest in plaintiffs' property for valuable consideration ($425,000).  It is also undisputed that neither Pinnacle Financial Corporation (at the time of the sale) nor HSBC (at the time of the assignment) had actual notice of plaintiffs' claims to the property.  However, a buyer without actual notice of a prior interest may be "held to be on inquiry notice where he or she is aware of circumstances which generate enough uncertainty about the state of title that a person of ordinary prudence would inquire further about those circumstances." <u>Id.</u> at 895.

Here, plaintiffs signed a notarized deed of sale transferring title to their property to the Smiths for $425,000.  <u>See</u> Deed of Sale.  Although the sales price of the property was below its appraised value ($627,000), the price was not so "grossly inadequate" that it could be said to provide Pinnacle Financial Corporation with constructive notice of the alleged fraud -- especially considering that plaintiffs were facing foreclosure at the time of the sale.  <u>See, e.g.</u>, <u>Iseli v. Clapp</u>, 255 A.2d 315, 319 (Md. 1969) (holding that $11,000 purchase price for property that "brought $14,700 at the foreclosure sale" several years later was not so "grossly inadequate" as

to put mortgagee on constructive notice of alleged fraudulent conveyance).  The only other fact alleged by plaintiffs that might have put Pinnacle Financial Corporation on inquiry notice of the purported fraud is plaintiffs' continued possession of the property even after its sale.

The D.C. Circuit has explained that "actual, visible, and unequivocal possession" of "real estate inconsistent with the record title and under an apparent claim of ownership is notice to purchasers of whatever interest the person actually in possession has in the fee."  McKinley v. Crawford, 58 F.2d 528, 529 (D.C. Cir. 1932); see also Clay Props., Inc., 604 A.2d at 896 (internal citations omitted) (noting that physical possession can be "a circumstance providing notice" of competing claims to property if possession is "'open and unambiguous,'" and "'sufficiently distinct and unequivocal to put the purchaser on his guard'").  However, there is an exception to this rule where the seller "remains for a time in possession after giving a fee-simple deed, with covenants, which he permits to be recorded."  McKinley, 58 F.2d at 529-30; see also Crossley v. Hartman, 235 A.2d 743, 751 (Md. 1967) (finding that "continued possession by a prior owner is not so inconsistent with the record title as to amount to constructive notice" that "the original conveyance was procured by fraud").  In other words, the continued possession of property by the seller will not put subsequent purchasers on notice of the seller's claim, where the seller has signed a fee simple deed, which has been recorded.  McKinley, 58 F.2d at 529-30.

It is for this reason that numerous courts in cases involving allegedly fraudulent mortgage foreclosure rescue schemes have held that where a plaintiff signs a deed of sale transferring property to a person who funds the purchase with a loan secured by a deed of trust, the deed-of-trust holder and its assignees are not on inquiry notice of the fraud, even where the plaintiff continues to reside in the property after the alleged fraudulent "sale."  See Deutsche Bank Nat'l

Trust Co. v. Booker, 2010 WL 333718, at *1-2 (D. Md. Jan. 25, 2010) (finding that assignee of deed of trust in plaintiff's property had no notice of fraud, even though plaintiff, who claimed that she had been the victim of a fraudulent mortgage foreclosure rescue scheme, continued to reside in the property after the sale); Deutsche Bank Nat'l Trust Co. v. Brown, 2009 WL 2730223, at *1-2 (D. Md. 2009) (holding that assignee of deed of trust in plaintiff's property was a bona fide purchaser for value even where plaintiff continued to reside in the property for years after he was allegedly fraudulently induced to sell the property); Wells Fargo Bank v. Henson, 649 F. Supp. 2d 431, 434 (D. Md. 2009) (internal quotation marks and citation omitted) (holding that assignee of deed of trust in plaintiffs' property was a bona fide purchaser because there was "nothing about th[e] transaction that would have indicated to [the original deed-of-trust holder] that there was any fraud," even though plaintiffs continued to live there post-sale). The purpose of this exception is to encourage reliance on recorded deeds, and to promote "the equitable maxim that, where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." McKinley, 58 F.2d at 530.

Here, it is plaintiffs who "enabled" the fraud, as it is plaintiffs who signed a fee-simple deed transferring title to their property without reading it. Hence, plaintiffs' continued possession of the property after the "sale" was not sufficient to put Pinnacle Financial Corporation (and thus HSBC, as its assignee) on inquiry notice of the alleged fraud. Plaintiffs have pointed to no other aspect of the transaction that would have put Pinnacle Financial Corporation or HSBC on inquiry notice of the alleged fraud. In the absence of such evidence, HSBC must be deemed a bona fide purchaser for value, whose interests in the notes and deeds of trust are valid, even if the Smiths obtained title to the property by fraud. As such, HSBC has a

beneficial interest in the property and plaintiffs' remaining claim against it for a declaratory judgment must fail.

## II.     The Smiths

The Smiths argue that they are entitled to summary judgment on all twelve of plaintiffs' claims against them (Counts 1-6, Counts 8-11, Count 13, and Count 17),[9] as well as on their two counter-claims against plaintiffs for unjust enrichment and declaratory relief.   The Court will address the Smiths' arguments with respect to each of these claims in turn.

### A.     Fraud (Count 1)

In Count 1, plaintiffs allege that the Smiths, EK Settlements, Sandy Kim, Ocwen, and HSBC defrauded plaintiffs both by "preparing and recording the noted documents" and "by stealing their money, title, and equity in their residence."  2nd Am. Compl. ¶¶ 24-25.  The Smiths argue that they are entitled to summary judgment on this claim for two reasons.  First, they contend that plaintiffs' fraud claim must fail because the amended complaint only alleges that the Smiths aided and abetted the other party-defendants in committing fraud -- not that they "aided and abetted non-parties, including Carline Charles and C&O," who were the real perpetrators of the fraud.  See Smiths' Mot. at 16.  Because the fraud claim against Ocwen and HSBC has already been dismissed, and because there is no evidence that the Smiths aided and abetted EK Settlements -- with whom Bell-Smith had only one brief meeting -- the Smiths argue that judgment in their favor must be granted.  Id. at 12-19.  Second, the Smiths maintain that

---

[9] Count 7 of plaintiffs' Second Amended Complaint (breach of fiduciary duty) is raised only against EK Settlements and its president, Sandy Kim, while Count 12 of plaintiffs' Second Amended Complaint (negligence) is raised only against EK Settlements, Sandy Kim, HSBC, and Ocwen.  See 2nd Am. Compl. ¶¶ 60-66; 86-90.

plaintiffs cannot establish a necessary element of fraud -- that the Smiths made a material misrepresentation to plaintiffs upon which plaintiffs detrimentally relied -- since there was no communication between plaintiffs and the Smiths until the spring of 2007, more than a year after the alleged "fraud" transpired. See id. at 23-35. Both of these arguments lack merit.

With respect to their first argument, the Smiths are technically correct that Count 1 of plaintiffs' Second Amended Complaint makes no mention of Charles or C&O Property Solutions. That does not mean, however, that "the pivotal question on summary judgment is whether Defendants Jewell Bell-Smith and Darryl Smith 'aided and abetted' Defendants EK Settlements and/or Sandy Kim in committing the alleged 'fraud.'" Smiths' Mot. at 14. Seizing on some admittedly sloppy drafting with regard to Count 1, the Smiths would have this Court ignore the thrust of plaintiffs' Second Amended Complaint, which is that the Smiths "aided and abetted" not only EK Settlements and Sandy Kim, but also Charles and C&O Property Solutions, in defrauding plaintiffs' out of their home. Although Count 1 fails to make this allegation explicit, plaintiffs have, elsewhere in their complaint, made clear their contention that "Jewell Bell-Smith, Darryl A. Smith . . . C&O Property Solutions, [and] Caroline [sic] Charles . . . willfully and intentionally concealed material facts and information from Plaintiffs" by "jointly and severally" engaging in a fraudulent mortgage foreclosure rescue scheme. See 2nd Am. Compl. ¶ 14.

Plaintiffs' omission of any reference to Charles or C&O Property Solutions in Count 1 appears to be due to the fact that plaintiffs believed their use of the word "Defendants" encompassed Charles and C&O Property Solutions -- who were, in fact, named defendants in earlier versions of the complaint. Indeed, in portions of the Second Amended Complaint, plaintiffs mistakenly refer to Charles and C&O Property Solutions as "defendants." See 2nd

Am. Compl. ¶ 14 (emphasis added) (referring to "Defendants . . . C&O Property Solutions, [and] [sic] Caroline Charles").  Hence, despite the poor drafting of Count 1, this Court rejects the Smiths' narrow reading of plaintiffs' fraud claim as alleging only that plaintiffs engaged in fraudulent conduct with EK Settlements and Sandy Kim.  As plaintiffs make clear in their opposition to the Smiths' motion for summary judgment, plaintiffs contend that "all named defendants to this suit as well as C&O and Carline Charles worked in concert to defraud Plaintiffs out of the title to and equity in their home."  Pls.' Opp. at 15 (emphasis added).

The Smiths' assertion that "Plaintiffs' only allegations against [the Smiths], must as a factual matter, be based upon claims of aiding and abetting the other party defendants," see Smiths' Mot. at 14, is also incorrect.  Plaintiffs are free to sue some tortfeasors and not others.  See Temple v. Synthes Corp., 498 U.S. 5, 7 (1990) (explaining that "[i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit").  Their complaint -- which contains allegations of wrongdoing by Charles and C&O Property Solutions, but fails to name either as a defendant -- does just that.

The Smiths' second argument -- that they cannot be held liable for fraud, since they made no false representations to plaintiffs, and indeed had no communications with plaintiffs until more than a year after the alleged "fraud" took place -- is equally unavailing.  In order to state a claim for common law fraud in the District of Columbia, plaintiffs must show: "'(1) a false representation (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation.'"  Fort Lincoln Ass'n, Inc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1074 n.22 (D.C. 2008) (quoting Bennett v. Kiggins, 377 A.2d 57, 59-60 (D.C. 1977)).  Fraud must also be "'particularly

pleaded,'" see Atraqchi v. GUMC Unified Billing Servs., 788 A.2d 559, 563 (D.C. 2002)

(quoting Bennett, 377 A.2d at 59-60), meaning that the plaintiff must particularly allege

"'matters such as the time, place, and content of the false misrepresentations, the misrepresented

fact and what the opponent retained or the claimant lost as a consequence of the alleged fraud.'"

Jackson v. ASA Holdings, --- F. Supp. 2d ----, 2010 WL 4449367, at *7 (D.D.C. Nov. 8, 2010)

(quoting Phrasavang v. Deutsche Bank, 656 F. Supp. 2d 197, 205 (D.D.C. 2009)).

      Here, plaintiffs have "particularly pleaded" that Charles and C&O Property Solutions

made intentionally false representations of material fact to plaintiffs in December 2005 and

January 2006 when they led plaintiffs to believe that the documents they were signing were

related to a mortgage refinancing rather than to the sale of their home.  See 2nd Am. Compl. ¶¶

8, 14; Lee Dep. at 31, 35-40; Chen Dep. at 38; Lee's Resp. to Interrog. no. 5; Welcome Letter.

      The Smiths correctly point out that plaintiffs have not alleged that the Smiths,

themselves, made any false representations to plaintiffs, which fraudulently induced plaintiffs to

sell their home.  But since plaintiffs' complaint can be fairly read to assert an "aiding and

abetting" or joint-tortfeasor theory of liability, plaintiffs need not show that the

Smiths themselves made any intentionally false statement of material fact in order to prevail on

their claim for common law fraud.  Because "a person who assists a tortious act may be liable for

other reasonably foreseeable acts done in connection with it," see Halberstam v. Welch, 705 F.2d

472, 484 (D.C. Cir. 1983) (applying D.C. law), the Smiths may be liable for the

misrepresentations by Charles and C&O Property Solutions if they qualify as "aiders and

abettors" of the alleged fraud, see id. at 487-88 (finding that an aider and abettor was civilly

liable for a murder that occurred during the course of a burglary -- even where the aider and

abettor was not present during the burglary -- because she knew of the murderer's general "illegal activity and assisted in it"); Ali v. Mid-Atl. Settlement Servs., 640 F. Supp. 2d 1, 7-8 (D.D.C. 2009), aff'd, Ali v. Tolbert, --- F.3d ----, 2011 WL 691364 (D.C. Cir. Mar. 1, 2011) (acknowledging that those who aid and abet the commission of fraud can be civilly liable for the underlying fraud).

D.C. courts have not yet recognized aiding and abetting as a separate, independent tort. See Halberstam, 705 F.2d at 479 (explaining that "[t]he separate tort of aiding-abetting has not, to our knowledge, been recognized explicitly in the District"); see also Flax v. Schertler, 935 A.2d 1091, 1108 n.15 (D.C. 2007) (noting that while the Halberstam court "predicted that this court would recognize a tort of aiding and abetting tortious conduct, we have not done so to date"); Acosta Orellana v. CropLife Int'l, 711 F. Supp. 2d 81, 107 (D.D.C. 2010) (stating that "[t]here does not appear to be case law in the District of Columbia that explicitly recognizes aiding and abetting as an actionable theory of liability"). But courts applying D.C. law have found aiders and abettors liable for the underlying tort where (1) the defendant assists the primary violator in performing "a wrongful act that causes an injury; (2) the defendant [is] generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant . . . knowingly and substantially assist[s] the principal violation." Halberstam, 705 F.2d at 487-88; see also Int'l Telecomms. Satellite Org. v. Colino, 1992 WL 93129, at *14 (D.D.C. Apr. 15, 1992) (finding that the defendant was "vicariously liable . . . for all injury caused by the wrongdoing of the primary actors" where he, "at the very least . . . aided and abetted others in perpetrating fraud").

In determining whether an aider and abettor has provided "substantial assistance" to the

principal violator, courts examine five factors: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor] and his state of mind." Halberstam, 705 F.2d at 478 (quoting Restatement (Second) of Torts § 876 (1979)). Here, there are genuine issues of material fact as to whether the Smiths were aiders and abettors of the alleged fraud perpetrated by Charles and C&O Property Solutions. Plaintiffs have set forth facts tending to show that the Smiths provided substantial assistance to Charles and C&O Property Solutions by agreeing to serve as "credit buyers" of plaintiffs' home and receiving $10,000 for their services, with a promise of more. See Smiths' Resp. to Interrog. nos. 6, 8; Charles/Bell-Smith 5/4/07 E-mail. The fact that the Smiths agreed to be "credit buyers" for other transactions orchestrated by Charles, see Smiths' Resp. to Interrog. no. 22, and that Bell-Smith asked no questions as to where the money to pay the loans would be coming from, see Bell-Smith Dep. at 87, 239 -- despite having previously worked as a mortgage loan processor, id. at 14, 24-25, Smiths' Resp. to Interrog. no. 4 -- raises at least some question as to whether the Smiths were "generally aware" of their role in an "overall illegal or tortious activity." Because there are genuine disputes of material fact as to whether the Smiths knew they were assisting Charles and C&O Property Solutions in executing a fraudulent mortgage foreclosure rescue scheme, or whether they, too, were innocent investors who were swindled by Charles, the Smiths' motion for summary judgment on Count 1 will be denied.

     B.     The D.C. Consumer Protection Procedures Act (Count 2)

In Count 2 of their Second Amended Complaint, plaintiffs allege violations of the D.C. Consumer Protection Procedures Act ("DCCPPA"), D.C. Code § 28-3901 et seq., which "creates a cause of action for consumers to seek redress for unlawful trade practices," Snowder v. Dist. of

Columbia, 949 A.2d 590, 598 (D.C. 2008).  See 2nd Am. Compl. ¶¶ 30-40.  Specifically, plaintiffs maintain that the Smiths and the other defendants "jointly and severally" violated D.C. Code § 28-3904(e)-(f) by making misrepresentations of material facts to plaintiffs or by failing to state material facts, "with the knowledge . . . that their omission would create a false understanding."  Id. ¶ 37.  Plaintiffs further allege that the Smiths violated D.C. Code § 28-3904(r) by entering into an unconscionable contract with plaintiffs through which they "took ownership of Plaintiffs' home for inadequate consideration."  Id. ¶¶ 35, 38.  The Smiths argue that they are entitled to summary judgment on plaintiffs' DCCPPA claims because plaintiffs "have failed to identify any specific intentional misrepresentation of a material fact by Defendants to Plaintiffs" upon which plaintiffs detrimentally relied in deciding to sell their home.  See Smiths' Mot. at 35-38.

The Court agrees with the Smiths that summary judgment is warranted on plaintiffs' claims under D.C. Code § 28-3904(e)-(f).  Plaintiffs have alleged that Charles and C&O Property Solutions made misrepresentations of material fact to plaintiffs (and omitted to state material facts), which fraudulently induced plaintiffs to sell their home.  See, e.g., 2nd Am. Compl. ¶¶ 8, 14; Lee Dep. at 31, 35-40; Chen Dep. at 38; Lee's Resp. to Interrog. no. 5.  However, plaintiffs have pointed to no misrepresentations or omissions made by the Smiths that could form the basis of a DCCPPA claim under D.C. Code § 28-3904(e)-(f).  Nor have plaintiffs set forth any theory akin to "aiding and abetting" upon which the Court could find the Smiths liable for the DCCPPA violations allegedly committed by Charles and C&O Property Solutions.  Accordingly, the Court will grant the Smiths' summary judgment motion as to plaintiffs' claims alleging misrepresentations and omissions in violation of D.C. Code § 28-3904(e)-(f).

Plaintiffs also allege that the Smiths violated D.C. Code § 28-3904(r), which prohibits the making or enforcing of "unconscionable terms or provisions of sales." Because the DCCPPA "'was designed to police trade practices arising only out of consumer-merchant relationships,'" Snowder, 949 A.2d at 599 (quoting Howard v. Riggs Nat'l Bank, 432 A.2d 701, 709 (D.C. 1981)) (citing Carleton v. Winter, 901 A.2d 174, 179 (D.C. 2006); DeBerry v. First Gov't Mortg. and Investors Corp., 743 A.2d 699, 701 (D.C. 1999)), plaintiffs' unconscionability claim is only viable if the Smiths can be considered "merchants" within the meaning of the DCCPPA. Significantly, courts in the District of Columbia have "construe[d] and appl[ied] the CPPA 'liberally to promote its purpose,'" Fort Lincoln, 944 A.2d at 1072 (quoting D.C. Code § 28-3901(c)); see also Modern Mgmt. Co. v. Wilson, 997 A.2d 37, 63 (D.C. 2010), and have therefore interpreted the DCCPPA's "operative terms broadly, in accordance with [the statute's] goal of 'assur[ing] that a just mechanism exists to remedy *all* improper trade practices,'" Ihebereme v. Capital One, N.A., 730 F. Supp. 2d 40, 50-51 (D.D.C. 2010) (emphasis in original) (quoting D.C. Code § 28-3901(b)(1)).

At the time of the sale of plaintiffs' property, the DCCPPA defined "merchant" to mean "a person who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice." See D.C. Code § 28-3901(a)(3) (2005).[10]

---

[10] The D.C. City Council amended the DCCPPA's definition of "merchant" in June 2007 to include only those persons who supply consumer goods or services "in the ordinary course of business." See Nonprofit Organizations Oversight Improvement Amendment Act of 2007, § 2(a), D.C. Legis. 17-4 (June 12, 2007) (defining "merchant" as "a person . . . who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who in the ordinary course of business does or would supply the goods or services which are or would be the subject matter of a trade practice"). The

Goods or services are defined to include "any and all parts of the economic output of society . . .

[including] consumer credit . . . real estate transactions, and consumer services of all types." Id.

§ 28-3901(a)(7) (emphasis added).  D.C. courts have found that "a 'merchant' is not limited to the

actual seller of the goods or services complained of," but only "must be a 'person' connected with

the 'supply' side of a consumer transaction."  Howard, 432 A.2d at 709 (internal citation

omitted).  Moreover, D.C. courts have expressly held that the DCCPPA applies to "real estate

mortgage finance transactions."  See DeBerry, 743 A.2d at 703; see also Ihebereme, 730 F.

Supp. 2d at 51 (noting that "courts have consistently treated mortgagees' practices as subject to

the DCCPPA").

        The applicability of the DCCPPA here depends on whether the Smiths were acting as

indirect sellers of "consumer credit" or as ordinary home-buyers when they purchased plaintiffs'

home.  Clearly, ordinary home-buyers do not qualify as "merchants" within the meaning of the

DCCPPA, as they do not sell consumer goods or services, and are, in fact, "on the 'consume'

rather than the supply side of the transaction."  Ali, 2011 WL 691364, at *5.  The Smiths attempt

to portray themselves as ordinary home-buyers, alleging that they were not, and have never been,

"engaged in the business of mortgage lending" or "providing consumer financial services."

See Smiths' Mot. at 38 (internal quotation marks and citation omitted).  Plaintiffs counter that the

Smiths were not regular purchasers of property, but understood themselves to be "credit buyers,"

who were paid to "obtain a loan" on plaintiffs' behalf.  Lee's Resp. to Interrog. no. 22.  Because

---

D.C. Circuit has, however, declined to "apply the 2007 amendment retroactively . . . because
there is 'no indication that the Council intended [the change] to be retroactive.'"  Ali, 2011 WL
691364, at *5 n.6 (quoting Childs v. Purll, 882 A.2d 227, 238 (D.C. 2005)).  This Court will
therefore analyze plaintiffs' DCCPPA claim using the definition of "merchant" in effect at the
time of the sale of plaintiffs' property in December 2005.

the Smiths, in essence, "sold" their credit to plaintiffs -- via Charles and C&O Property Solutions -- plaintiffs contend that the Smiths are subject to the DCCPPA.  See Pls.' Opp. at 22-23.

The D.C. Circuit recently examined the circumstances under which an individual's involvement in a real estate transaction can render him a "merchant" for purposes of the DCCPPA.  See Ali, 2011 WL 691364, at *5-6.  In Ali v. Mid-Atl. Settlement Servs., the plaintiff brought claims under the DCCPPA, alleging that she had been the victim of a scheme to defraud her out of her home.  640 F. Supp. 2d at 3.  The plaintiff, who was facing foreclosure at the time, had encountered the defendant, her classmate from junior high school, outside the premises of the defendant's employer, "EZ Mortgage."  EZ Mortgage had just told the plaintiff that it would not approve her mortgage refinancing, and the plaintiff asked the defendant whether he could help save her home from foreclosure.  Id. at 3.  Defendant subsequently contacted the plaintiff, and told her that he knew someone willing to pay $150,000 for her property.  Id. at 3-4.  The defendant arranged the sale to this third party, and the plaintiff later sued, arguing, in part, that the defendant had violated the DCCPPA by "having [the plaintiff] 'agree to sell [her property] on unconscionable terms.'"  Id. at 6 (internal citation omitted).  The district court granted summary judgment for the defendant, finding that he was "not a merchant under the DCCPPA" because he was not a "commercial participant" in the sale, as he did not receive any payment, and "did not make or enforce any of the purportedly unconscionable terms in the contract."  Id. at 7.

Affirming the judgment of the district court, the D.C. Circuit explained that the defendant could not be considered a merchant, given the absence of any evidence suggesting that he "supplied, or even held himself out as a person who would supply, any goods or services to [the plaintiff] in connection with her ownership or sale of the house."  Ali, 2011 WL 691364, at *5.

In so holding, the D.C. Circuit distinguished Byrd v. Jackson, where the court had found the defendant "to be a 'merchant' under the CPPA because he offered to assist a homeowner - the plaintiff's late grandmother - prevent foreclosure on her home." See Ali, 2011 WL 691364, at *6 (citing Byrd v. Jackson, 902 A.2d 778 (D.C. 2006)). Whereas the court in Byrd found "ample evidence" that the defendant had "offered his services to [the plaintiff's grandmother] as one who would help her avoid foreclosure," Byrd, 902 A.2d at 781, the D.C. Circuit in Ali found no such evidence to support the claim that the defendant had offered any "services" in connection with the sale of the plaintiff's property, see Ali, 2011 WL 691364, at *6. "At most," the court explained, the defendant had assisted the buyer "in purchasing the property, placing him on the 'consume' rather than the supply side of the transaction." Id. at *5. Because the defendant neither supplied goods or services, nor held himself out as one who could supply such goods or services, the D.C. Circuit held that he was not a "merchant" under the DCCPPA, id. at *5-6.

The Smiths' level of commercial activity falls somewhere in between that of the defendants in Ali and in Byrd. In contrast to Byrd -- where the defendant mailed actual solicitations advertising himself as a "foreclosure specialist" and the plaintiff dealt with him "on that understanding," Byrd, 902 A.2d at 781 -- the Smiths never directly offered any services to plaintiffs to help them avoid foreclosure. But unlike in Ali, there is evidence that the transaction between plaintiffs and the Smiths had features of a credit agreement, in which the Smiths sold their credit services to plaintiffs via an intermediary (Charles). Bell-Smith repeatedly refers to herself as a "credit buyer" in her e-mail exchanges with Charles, see, e.g., Charles/Bell-Smith 5/4/07 E-mail ("I had an agreement with C&O Property Solutions to be [a] [c]redit buyer for 1 year and 1 year only"), and she concedes that she was paid $10,000 for participating in the

transaction, see Smiths' Resp. to Interrog. no. 22.  Moreover, the Smiths appear to have always understood their role in the transaction to be distinct from that of ordinary home-buyers, as they believed they would only hold title to the property for a twelve-month period, during which time plaintiffs could "reestablish their credit."  See id. no. 13-14.

Significantly, the DCCPPA does not require that a party hold himself out as a supplier of consumer goods or services, or that he advertise or solicit business, in order to be considered a "merchant"; rather, the term "merchant" includes all persons who "sell" or "transfer, either directly or indirectly, consumer goods or services."  See D.C. Code § 28-3901(a)(3) (2005). "Goods or services," in turn, are defined by statute to include "consumer credit."  Id. § 28-3901(a)(7).  Here, plaintiffs have presented evidence showing that their transaction with the Smiths was, in effect, a credit arrangement -- rather than a sale -- in which the Smiths "sold" or "transferred" credit to plaintiffs, in return for a $10,000 payment from Charles.  In light of all the evidence, then, plaintiffs have at least raised a genuine issue of material fact relevant to whether the Smiths were "merchants" within the meaning of the DCCPPA, as interpreted by the courts.

Plaintiffs have also raised a genuine issue of material fact as to whether the Smiths' execution of the deed of sale was "unconscionable" under D.C. Code § 28-3904(r).  Whether a transaction is "unconscionable" within the meaning of D.C. Code § 28-3904(r) depends on a number of factors, including "knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer"; and "knowledge by the person at the time of the sale . . . of the inability of the consumer to receive substantial benefits from the property or services sold."  See D.C. Code § 28-3904(r)(1)-(2).  Here, the disparity between the price that plaintiffs paid for the Smiths' "credit services" and

the benefits that plaintiffs derived from these services suggests that the Smiths may have known that plaintiffs would not "receive substantial benefits" from the subject transaction. Plaintiffs essentially gave their home -- which was worth an estimated $627,000 at the time -- to the Smiths for $269,393.47 ($32,119.79 in cash and satisfaction of the $172,040.59 mortgage and $65,224.09 lien on the property). See HUD-1 Statement. The remainder of the purchase price evaporated in the form of closing costs and unexplained fees. Id. Plaintiffs have pointed out that they likely would have been better off selling their home in foreclosure and receiving a share of the proceeds than selling their property to the Smiths under the terms of the transaction as written. See, e.g., Lee's Resp. to Interrog. no. 21. Given that the transaction was -- on its face -- so unfavorable to plaintiffs, there is reason to believe that the Smiths knew plaintiffs would not "receive substantial benefits" from their purported credit-buying services.

There is also a genuine issue of material fact as to whether the Smiths knew there was "no reasonable probability" that plaintiffs would be able to re-purchase their home (or undertake the Smiths' $425,000 loan obligations). The Smiths claim that they believed plaintiffs would buy back their property after twelve months had elapsed. See Smiths' Resp. to Interrog. no. 8. But the Smiths knew that plaintiffs had poor credit, see id. at no. 13-14, and that they were having difficulty paying their existing $172,040.59 mortgage. As plaintiffs allege, "Defendants knew that if Plaintiffs could not pay their mortgage for a $177,000 loan, then they definitely could not pay a mortgage for a $425,000 loan." Lee's Resp. to Interrog. no. 21. The Smiths undertook no investigation of plaintiffs' financial situation, see Smiths' Resp. to Interrog. no. 25, which seems odd if their credit buying "plan" actually did entail re-purchase of the property by plaintiffs in twelve months. Regardless, plaintiffs have at least raised a genuine issue of material fact as to

whether the Smiths knew (1) there was "no reasonable probability" that plaintiffs would be able to re-purchase their home and that (2) plaintiffs would be unable to "receive substantial benefits" from the transaction.  For these reasons, the Court will deny the Smiths' motion for summary judgment as to plaintiffs' claim alleging a violation of D.C. Code § 28-S3904(r).

C.     The D.C. Loan Shark Act (Count 3)

In Count 3 of their Second Amended Complaint, plaintiffs allege that the Smiths violated the D.C. Loan Shark Act, D.C. Code § 26-901 et seq., which makes it "unlawful and illegal to engage in the District of Columbia in the business of loaning money upon which a rate of interest greater than 6% per annum is charged . . . without procuring a license."  Id.  The Smiths counter that this claim cannot survive a motion for summary judgment because "Defendants did not provide a loan to the Plaintiffs" and "Plaintiffs have not and cannot provide any rational basis upon which a finder of fact may conclude that interest in excess of six percent (6%) was charged on any such loan."  Smiths' Mot. at 40.

"[U]nder the law of the District of Columbia, substance rather than form determines whether 'usury or loan sharking laws . . . apply to a particular transaction.'"  Juergens v. Urban Title Servs., Inc., 246 F.R.D. 4, 16 (D.D.C. 2007) (quoting Browner v. Dist. of Columbia, 549 A.2d 1107, 1114 (D.C. 1984)).  In Browner, the D.C. Court of Appeals examined whether the D.C. Loan Shark Act could apply to real estate "transactions [that] were denominated as sales," where the defendants had allegedly fraudulently induced numerous homeowners to sign sales documents by telling them that they were loan documents, which would save their homes from foreclosure.  549 A.2d at 1110.  Answering this question in the affirmative, the court explained that whether the defendants were lending money -- as opposed to purchasing homes -- was "not a

legal issue but a factual one." Id. at 1114.  The court went on to affirm the trial judge's conclusion that "the purported sales were really sham transactions that masked loans." Id.  In support of this finding, the court cited the fact that there had been no negotiation between the parties over the sales price of the properties; that the actual sales prices "bore no relation whatever to the value of the equity"; that "[n]one of the 'sellers' had placed his or her home on the market or expressed the slightest interest in selling it"; that "[e]ach 'seller' remained in possession [of his property] after the purported sale"; and that the defendants had "depict[ed] their service as one that would enable their clients to 'save' their home from foreclosure." Id.

These exact features characterize the purported "sale" at issue here.  Plaintiffs did not negotiate with the Smiths over the "sales price" of the property, see Lee Aff. ¶ 10; Chen Aff. ¶ 10; the actual sales price ($425,000) was well below the property's market value ($627,000), see Deed of Sale; Dec. 2005 Appraisal; plaintiffs never believed that they had placed their home on the market and never expressed any interest in selling it, see Lee Aff. ¶¶ 4, 7, 10; Chen Aff. ¶¶ 3, 7; plaintiffs remained in possession of the property for years after the alleged "sale", see 2nd Am. Compl. ¶ 99; and Charles and C&O Property Solutions -- who arranged the transaction between plaintiffs and the Smiths -- always depicted the arrangement as a mortgage refinancing, rather than as a sale, see Lee Dep. at 31, 35-40; Chen Dep. at 38; Lee's Resp. to Interrog. no. 5; Welcome Letter.  In light of this evidence, plaintiffs have raised a genuine issue of material fact as to whether -- despite the signed deed of sale and the HUD-1 settlement statement -- their arrangement with the Smiths is more properly characterized as a "loan" than a "sale."  See Browner, 549 A.2d at 1115 (explaining that "a transaction which is a sale in form is to be treated

as a loan when this more accurately reflects the substance of the arrangement").[11]

Nevertheless, plaintiffs' claim under the Loan Shark Act ultimately fails because plaintiffs have not set forth any facts showing that the Smiths were "engaged in the business of loaning money." D.C. municipal regulations define "engaged in the business of loaning money" to mean:

> [T]he holding out in the District of Columbia, by the maintenance of a place of business in the District of Columbia or in any other manner, that a loan or loans of money may be effected by or through the person so holding out, plus the performance in the District of Columbia by that person of one or more acts which result in the making or in the collection of a loan of money.

See D.C. Mun. Regs. Tit. 16, § 299; see also In re Parkwood, Inc., 461 F.2d 158, 165 n.10 (D.C. Cir. 1971). Although the Smiths' transaction with plaintiffs arguably constitutes a loan, plaintiffs have not alleged that the Smiths "held themselves out" as lenders. It was Charles, not the Smiths, who told plaintiffs that she could obtain a mortgage refinancing on their behalf. Plaintiffs have cited no other evidence that the Smiths ever represented to plaintiffs (or others) that a "loan or loans of money [could] be effected by or through [them]." Thus, even if the transaction between plaintiffs and the Smiths is viewed as a loan rather than a sale, the Smiths cannot be said to have "engaged in the business of loaning money" within the meaning of the

---

[11] Plaintiffs have also raised a genuine issue of material fact as to whether, if their transaction with the Smiths was, in fact, a "loan," the Smiths charged interest in excess of 6% on that loan. Plaintiffs, at least for a time, made monthly $1,900 payments to the Smiths, which were applied to the two notes that the Smiths obtained to finance their "purchase" of plaintiffs' home. See Smiths' Resp. to Interrog. no. 10. Both of these notes had interest rates above 6% at the time of the alleged "sale." See Smiths' Mot., Exs. 2-3 (showing that the $340,000 note had an adjustable interest rate, which, at the time of the transaction, was 7.5%, while the $85,000 note had a fixed 11.875% interest rate). To the extent that the Smiths obtained these two loans on plaintiffs' behalf and merely extended the loans to plaintiffs, then, see Lee's Resp. to Interrog. no. 22, the interest on the loans provided to plaintiffs exceeds 6%.

Loan Shark Act.  Hence, the Smiths' motion for summary judgment on Count 3 will be granted.

        D.        The D.C. Interest and Usury Law (Count 4)

Plaintiffs in Count 4 allege violations of the D.C. Interest and Usury Law, D.C. Code § 28-3301, on the ground that the Smiths failed "to reveal and deliver material disclosures to Plaintiffs required in connection with the said subject transaction."  2nd Am. Compl. ¶¶ 48-49. Although not entirely clear from the face of the amended complaint, it appears that plaintiffs base this claim on D.C. Code § 28-3301(f)(3), which requires that lenders, prior to the execution of a loan, "furnish the borrower a separate statement, in writing, which complies with the disclosure provisions of the Truth-In-Lending Act."  See also Williams v. Cent. Money Co., 974 F. Supp. 22, 28 (D.D.C. 1997) (explaining that "[u]nder D.C. law, a loan secured by a mortgage or deed of trust violates the Usury Statute if the lender fails to furnish the borrower with a separate written statement that complies with the disclosure provision of the Truth in Lending Act").  The Smiths have not alleged that they provided these disclosures to plaintiffs; instead, they argue that they are entitled to summary judgment because D.C. Code § 28-3301(f)(3) does not apply to them, as "Plaintiffs have not and cannot identify a single document whereby Defendants purportedly loaned or agreed to loan any funds to them."  Smiths' Mot. at 41.

The Smiths are correct that the absence of a written document evidencing their alleged credit arrangement with plaintiffs is fatal to this claim.  D.C. Code § 28-3301(f)(3) only applies to "consumer credit transactions," which are defined by statute as credit transactions that are either (1) evidenced by a written agreement; or (2) occur between a consumer and "a creditor who has solicited or advertised in the District of Columbia."  See D.C. Code § 28-3301(h) (emphasis added).  Because plaintiffs' "credit" agreement with the Smiths -- to the extent that it

existed -- was not memorialized in writing, and because there is no evidence that the Smiths "solicited or advertised" their credit services in the District of Columbia, the Smiths' motion for summary judgment on Count 4 will be granted.

      E.      <u>The D.C. Consumer Credit Service Organization Act (Count 5)</u>

      Plaintiffs in Count 5 allege that the Smiths violated the D.C. Consumer Credit Service Organization Act ("CCSOA"), D.C. Code § 28-4601 <u>et seq.</u>, which "precludes consumer credit service organizations from engaging in certain prohibited conduct." <u>Sloan v. Urban Title Servs., Inc.</u>, 689 F. Supp. 2d 94, 118 (D.D.C. 2010). The Smiths argue that they are entitled to summary judgment on this claim because there is no evidence that they acted as a "'consumer credit [service] organization' within the meaning of the Act." Smiths' Mot. at 45.

      The CCSOA defines "consumer credit service organization" as:

> any person who, with respect to the extension of credit by others, sells, provides, performs, or represents that he or she can sell, provide, or perform, in return for the payment of money or other valuable consideration, any of the following services:
> (i)      Improvement of a consumer's credit record, history, or rating;
> (ii)     Obtain an extension of credit for a consumer; or
> (iii)    Provide advice or assistance to a consumer regarding any matter related to the consumer's personal, household, or family credit.

D.C. Code § 28-4601(2)(A).

      Here, plaintiffs' argument that the Smiths acted as a consumer credit organization within the meaning of D.C. Code § 28-4601(2)(A) sweeps too broadly. Even under plaintiffs' version of events, the Smiths did not purport to "obtain" an extension of credit for plaintiffs from Pinnacle Financial Corporation "in return for the payment of money or other valuable consideration." Rather, the Smiths, in return for $10,000 from Charles, agreed to obtain an extension of credit <u>in their own name</u>, and then the Smiths -- not Pinnacle Financial Corporation

-- "extended said loan to Plaintiffs," <u>see</u> Lee's Resp. to Interrog. no. 22. Because the Smiths did not broker a deal "with respect to the extension of credit <u>by others</u>," but rather, made their own alleged extension of credit to plaintiffs (after securing the funds to do so from Pinnacle Financial Corporation), the Smiths cannot be said to have acted as a "consumer credit service organization."

Moreover, the CCSOA only governs the extension of credit to "consumers," who are defined by statute as persons "solicited to purchase or who purchase[] the services of a consumer credit service organization." D.C. Code § 28-4601(1). Here, there is no evidence that the Smiths "solicited" plaintiffs to purchase their credit services; indeed, the Smiths had no interaction with plaintiffs until more than a year after plaintiffs allegedly received the Smiths' "credit services." <u>See</u> Bell-Smith Decl. ¶ 15; Lee's Resp. to Interrog. no. 6. Nor have plaintiffs set forth facts tending to show that they ever understood themselves to be "purchasing" the Smiths' services as a consumer credit service organization. Although the Smiths were paid $10,000 for their "credit buying" services, this payment came from Charles -- not from plaintiffs directly. There is no evidence in the record that plaintiffs were even aware this payment was made, much less that they understood this payment to be for the services of a "consumer credit service organization." For these reasons, the Smiths' motion for summary judgment on Count 5 will be granted.

     F.     <u>The Real Estate Settlement and Procedures Act ("RESPA") (Count 6)</u>

Count 6 of plaintiffs' Second Amended Complaint alleges that the Smiths violated the Real Estate Settlement and Procedures Act ("RESPA") by "giving or accepting kickbacks or other things of value" and splitting charges "for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for

services actually performed." 2nd Am. Compl. ¶ 59; <u>see also</u> 12 U.S.C. § 2607(a)-(b).

Even assuming that plaintiffs have set forth sufficient facts to establish a violation of RESPA, that claim fails because plaintiffs have not complied with the one-year statute of limitations for claims under 12 U.S.C. § 2607. RESPA provides that "[a]ny action pursuant to the provisions of section . . . 2607 . . . of this title may be brought . . . within 1 year . . . from the date of the occurrence of the violation." <u>See</u> 12 U.S.C. § 2614. Courts have held that the "date of the occurrence" language in § 2614 refers to the date of the closing. <u>See</u> <u>Snow v. First Am. Title Ins. Co.</u>, 332 F.3d 356, 359 (5th Cir. 2003); <u>see also</u> <u>Palmer v. Homecomings Fin., LLC</u>, 677 F. Supp. 2d 233, 237-38 (D.D.C. 2010) (explaining that "[a] cause of action under § 2607 accrues on the date of the closing"). Plaintiffs' transaction with the Smiths closed on December 28, 2005, but they did not file this suit until June 11, 2008 -- two and a half years after the "occurrence of the violation."

Courts "'may allow equitable tolling of a statute of limitations where a claimant has received inadequate notice'" of the facts that form the basis for his claim. <u>Hughes v. Abell</u>, --- F. Supp. 2d ----, 2010 WL 4630227, at *10 (D.D.C. 2010) (quoting <u>Freeman v. FDIC</u>, 56 F.3d 1394, 1405 n.2 (D.C. Cir. 1995) (internal citations omitted)). Here, it can be argued that plaintiffs did not "discover" the alleged fraudulent nature of the transaction until sometime in the spring or summer of 2007, thereby providing a basis for equitable tolling of RESPA's one-year statute of limitations. <u>See</u> Bell-Smith Decl. ¶ 15; Lee's Resp. to Interrog. no. 6. However, the D.C. Circuit has held that "the time limitation contained in § 2614 [is] a jurisdictional requirement," and thus "is not subject to equitable tolling under the doctrine of fraudulent concealment." <u>Hardin v. City Title & Escrow Co.</u>, 797 F.2d 1037, 1039 (D.C. Cir. 1986).

Although the Supreme Court has, since <u>Hardin</u>, narrowed the circumstances in which a statutory prerequisite to suit should be treated as jurisdictional, <u>see, e.g.</u>, <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 514 (2006) (explaining that courts should only treat a statutory prerequisite as jurisdictional "[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional"); <u>Henderson v. Shinseki</u>, --- S. Ct. ----, 2011 WL 691592, at *5-6 (2011) (confirming that "[u]nder *Arbaugh*, we look to see if there is any 'clear' indication that Congress wanted the rule to be jurisdictional"), courts in this district have continued to treat <u>Hardin</u> as good law with respect to RESPA's statute of limitations, <u>see, e.g.</u>, <u>Winstead v. EMC Mortg. Corp.</u>, 697 F. Supp. 2d 1, 3 (D.D.C. 2010) (citing <u>Hardin</u> for the proposition that RESPA's statute of limitations is not subject to equitable tolling); <u>Blackmon-Malloy v. U.S. Capitol Police Bd.</u>, 575 F.3d 699, 705 (D.C. Cir. 2009) (quoting <u>Hardin</u>, 797 F.2d at 1039) (explaining that <u>Hardin</u> "held that time limits in the [RESPA] . . . were jurisdictional because they fell under the statutory heading 'Jurisdiction of the Courts' and '[b]ecause the time limitation contained in [that statute] is an integral part of the same sentence that creates federal and state court jurisdiction'").  Moreover, even if equitable tolling were allowed for plaintiffs' RESPA claim, the Court would decline to find tolling warranted, given that all of the alleged "charges" and "kickbacks" that form the basis of plaintiffs' RESPA claim are apparent from the face of the HUD-1 settlement statement that plaintiffs signed on December 28, 2005.  Hence, plaintiffs' RESPA claim must be dismissed for failure to comply with the one-year statute of limitations.

G.    <u>Conversion (Count 8)</u>

Plaintiffs sue for conversion in Count 8, alleging that the Smiths converted "settlement funds" to which plaintiffs were lawfully entitled, and that they also converted plaintiffs'

"residential property and title." 2nd Am. Compl. ¶¶ 67-71. The Smiths seek summary judgment on this claim, arguing that (1) they are the lawful owners of plaintiffs' property because they paid $425,000 for the property pursuant to the deed of sale, which plaintiffs signed; and (2) plaintiffs have stated no facts to show that the Smiths received any of the alleged fraudulent disbursements of settlement funds reflected on the HUD-1 settlement statement. <u>See</u> Smiths' Mot. at 49-50.

Under District of Columbia law, the tort of conversion requires "'an unlawful exercise of ownership, dominion and control over the personalty of another in denial or repudiation of his right to such property.'" <u>Dennis v. Edwards</u>, 831 A.2d 1006, 1013 (D.C. 2003) (quoting <u>Blanken v. Harris, Upham, & Co., Inc.</u>, 359 A.2d 281, 283 (D.C. 1976)). Personalty means "[p]ersonal property as distinguished from real property." <u>See</u> Black's Law Dictionary 1260 (9th ed. 2009). Hence, in the District of Columbia, "the law of conversion does not apply to real property." <u>Dixon v. Midland Mortg. Co.</u>, 719 F. Supp. 2d 53, 56-57 (D.D.C. 2010). Because the District of Columbia does not recognize claims for the conversion of real property, plaintiffs' conversion claim based on the Smiths' alleged misappropriation of plaintiffs' property cannot withstand summary judgment.

However, with respect to their claim that the Smiths converted the settlement funds, plaintiffs have set forth sufficient facts to survive summary judgment. The HUD-1 settlement statement lists a number of bizarre, unexplained charges -- <i>i.e.</i>, the "security escrow" fee ($40,004.00), the "property management" fee ($45,996.00), and the "consultant" fee ($40,000.00). <u>See</u> HUD-1 Statement. Bell-Smith has conceded that she received a $10,000 payment from Charles pursuant to her transaction with plaintiffs, <u>see</u> Smiths' Resp. to Interrog. no. 6, and the record contains no evidence as to where this money came from. Plaintiffs have,

therefore, at least raised a genuine issue of material fact as to whether this $10,000 payment to Bell-Smith was taken from the settlement funds to which plaintiffs were lawfully entitled (and thus, whether Bell-Smith converted these funds). Hence, the Smiths' motion for summary judgment on Count 8 will be denied, insofar as Count 8 states a claim for conversion of the settlement funds, as distinguished from conversion of plaintiffs' real property.

      H.      <u>Injurious Falsehood, Disparagement, and Slander of Title (Count 9)</u>

Count 9 of plaintiffs' Second Amended Complaint purports to bring an action for "injurious falsehood, also known as disparagement and slander of title." 2nd Am. Compl. ¶ 73. Plaintiffs premise this claim on the Smiths' alleged publication and recording of a "false deed," arguing that the Smiths "acted with malice and reckless disregard for the truth upon recording the said false deed . . . when [they] knew the deed . . . would operate to falsely attached [sic] liens on Plaintiffs' property," and cause plaintiffs to lose title to their home. <u>Id.</u> ¶¶ 74-75.

   The tort of "injurious falsehood," which is closely related to the torts of libel and slander, developed "in the latter part of the sixteenth century in England as an action for 'slander of title,'" and "protects against false statements that disparage the plaintiff's interest in, or the quality of, the plaintiff's land, chattels, or intangibles." <u>Art Metal-U.S.A., Inc. v. U.S.</u>, 753 F.2d 1151, 1155 n.6 (D.C. Cir. 1985). In order to prove liability for injurious falsehood, a plaintiff must show "that (1) defendant's unprivileged publication of false statements concerning plaintiff's property or product, (2) with knowledge or reckless disregard of the falsity . . . , (3) was the proximate cause of pecuniary harm to the plaintiff." <u>Whetstone Candy Co., Inc. v. Nat'l Consumers League</u>, 360 F. Supp. 2d 77, 81 (D.D.C. 2004).

Plaintiffs' "injurious falsehood" claim suffers several fatal defects. First, plaintiffs have

failed to allege that the Smiths "published" any statement concerning the sale of plaintiffs' property. Although the "sale" of the property was published with the District of Columbia Land Records as well as in local publication notices, <u>see</u> Smiths' Mot. at 52, plaintiffs have not alleged that the Smiths themselves made these "publications." Second, plaintiffs have failed to show that these publications were false. Although plaintiffs have set forth a valid basis for finding the deed of sale voidable on account of fraud, a deed transferring title to property is not demonstrably "false" simply because it was procured through fraudulent means, and is, thus, voidable. Finally, plaintiffs have failed to allege or show how the actual <u>publication</u> of the deed -- as opposed to the <u>execution</u> of the deed -- caused them to suffer pecuniary harm. For these reasons, the Court will grant summary judgment in favor of the Smiths on plaintiffs' "injurious falsehood" claim.

I.  <u>Unjust Enrichment (Count 10)</u>

Plaintiffs allege in Count 10 that the Smiths were "unjustly enriched at the expense of Plaintiffs when they knowingly accepted the fraudulent benefit of the [plaintiffs'] real property, record title, and/or money." 2nd Am. Compl. ¶ 79. The Smiths counter that it was plaintiffs, not the Smiths, who have been unjustly enriched by the subject transaction. <u>See</u> Answer at 10-11. This is, then, a situation of a competing claim and counter-claim. According to the Smiths, plaintiffs were unjustly enriched by (1) the Smiths' payment of the existing loans on the property at the time of the sale; and (2) plaintiffs' continued possession of the property since the closing of the sale in December 2005. <u>See</u> <u>id.</u>; <u>see also</u> Smiths' Mot. at 59-61. The Smiths have moved for summary judgment on plaintiffs' claim for unjust enrichment against them, as well as on their counter-claim for unjust enrichment against plaintiffs. <u>See</u> Smiths' Mot. at 53-54, 59-61.

"Unjust enrichment occurs 'when a person retains a benefit (usually money) which in justice and equity belongs to another.'" <u>Griffith v. Barnes</u>, 560 F. Supp. 2d 29, 34 (D.D.C. 2008) (quoting <u>4934, Inc. v. Dist. of Columbia Dep't of Emp't Servs.</u>, 605 A.2d 50, 55 (D.C. 1992)). Where that is the case, "the recipient of the benefit has a duty to make restitution to the other person 'if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for [the recipient] to retain it.'" <u>4934, Inc.</u>, 605 A.2d at 55-56 (quoting Restatement of Restitution § 1 comment c (1937)). Claims of unjust enrichment are heavily fact-dependent, "for whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next." <u>Id.</u> at 56. To a certain extent, the core factual dispute here is framed in the competing unjust enrichment claims.

With respect to plaintiffs' unjust enrichment claim, they have set forth sufficient facts to withstand summary judgment. Plaintiffs have provided evidence that the Smiths' "purchase" of plaintiffs' home was unjust, and that the Smiths retained several "benefits" from the sale that rightfully belong to plaintiffs: namely, the title to the property, the $10,000 payment from Charles, and the monthly $1,900 payments that plaintiffs made on the Smiths' loans for at least seven months. <u>See</u> Bell-Smith Decl. ¶ 19; Lee's Resp. to Interrog. no. 16.

The Smiths are also not entitled to summary judgment on their unjust enrichment counter-claim. It is true that plaintiffs have enjoyed benefits from the sale of their property to the Smiths. Not only did the Smiths provide the funds that were used to satisfy plaintiffs' $172,040.59 mortgage and the additional $65,224.09 lien on the property, and to make the $32,119.79 cash payment to Lee, but the Smiths' "purchase" of plaintiffs' home has also enabled

plaintiffs to continue to reside there from December 2005 through (at least) the filing of this lawsuit.  However, it remains for the trier-of-fact to determine whether it was unjust for plaintiffs to retain these benefits, given the circumstances under which the Smiths allegedly obtained title to the property.  Such a determination will ultimately depend on disputed material facts, such as the precise nature of the Smiths' relationship to Charles and C&O Property Solutions, and whether the Smiths knew that the so-called "mortgage refinancing" scheme in which they participated was fraudulent.  Moreover, the dollar amount by which either plaintiffs or the Smiths were unjustly enriched will depend on several facts not present in the current record, such as the estimated rental value of the property, the number of months that plaintiffs have lived there rent-free, and the precise amount that plaintiffs and the Smiths have each paid toward the two notes since 2008.  For these reasons, the Smiths' motion for summary judgment on plaintiffs' unjust enrichment claim and their unjust enrichment counter-claim will be denied.

   J.  <u>Breach of Contract (Count 11)</u>

   In Count 11, plaintiffs allege that the Smiths breached their contract with plaintiffs by failing to "credit, pay, or tender the required consideration of $425,000.00" to plaintiffs at settlement, "as stated in the . . . recorded Deed" and in the HUD-1 settlement statement.  2nd Am. Compl. ¶ 84.  This claim fails for several reasons.  First, plaintiffs have asked in Count 11 <u>both</u> that they be awarded damages for breach of contract <u>and</u> that this Court declare "all said contracts [to] be . . . null and void and with no further force and effect."  <u>Id.</u>  It is axiomatic that "[o]ne cannot rescind for breach of [contract] and at the same time recover damages for the breach."  <u>Dean v. Garland</u>, 779 A.2d 911, 915 (D.C. 2001) (internal quotation marks omitted and citation omitted).  In other words, plaintiffs may not have their contracts with the Smiths

declared "null and void" <u>and</u> receive damages for breach of those contracts.

Even assuming that plaintiffs have made these arguments only in the alternative, <u>see, e.g.</u>, <u>Modern Mgmt.</u>, 997 A.2d at 44 n.10 (explaining that a plaintiff need not elect between the remedies of rescission and damages before a case is submitted to a jury), plaintiffs' breach of contract claim still must fail. Plaintiffs do not contest that the Smiths paid $425,000 for plaintiffs' property, as indicated in the deed of sale and the HUD-1 settlement statement. Nor have plaintiffs alleged that any of the disbursements of the $425,000, as reflected on the settlement statement, did not occur. All parties concede that the $425,000 purchase price was used to pay (1) the existing $172,040.59 mortgage; (2) a $65,224.09 lien on the property; (3) a $32,119.79 cash payment directly to Lee; (4) $23,063.69 in closing costs; and (5) several unexplained charges -- <i>i.e.</i>, the "security escrow" fee ($40,004.00), the "property management" fee ($45,996.00), and the "consultant" fee ($40,000.00). <u>See</u> HUD-1 Statement.

There remains a genuine issue of material fact as to who <u>received</u> the suspicious "security escrow" fee, "property management" fee, and "consultant" fee. But these payments were clearly written on the settlement statement. There is thus no genuine issue of material fact as to whether the only two "contracts" that plaintiff points to in Count 11 -- the deed and the HUD-1 settlement statement -- were honored as written. While plaintiffs have raised viable objections to the terms of these contracts (insofar as they included the fees discussed above), as well as the circumstances under which the contracts were executed -- which give rise to other claims in this case -- there is no dispute that the Smiths fulfilled their sole contractual obligation to plaintiffs by paying $425,000 for the property. Hence, the Smiths are entitled to summary judgment on plaintiffs' breach of contract claim.

K.    Declaratory Judgment (Count 13) and Quiet Title (Count 17)

Finally, in Counts 13 and 17 plaintiffs seek to quiet title and request that the Court enter a declaratory judgment that the deed of sale and the "$425,000 Deed of Trust liens on the Plaintiffs' property" are "null and void"; that the property is vested solely in plaintiffs' names such that they "have absolute ownership and the right of disposition of the subject real property"; and that the Court issue an injunction prohibiting "Defendants from asserting title to the subject real property." See 2nd Am. Compl. ¶¶ 97, 103. The Smiths have counter-claimed for declaratory relief, demanding that the deed be declared valid and enforceable; that they be declared the lawful owners of the property; and that, if the deed is voided, plaintiffs receive title to the property subject to the existing deeds of trust. The Smiths seek summary judgment on plaintiffs' claims against them in Count 13 and Count 17, as well as on their declaratory judgment counter-claim against plaintiffs. See Smiths' Mot. at 58-62.

The Smiths' motion for summary judgment on Count 13 and Count 17, and on their counter-claim against plaintiffs for declaratory relief, will be denied. Genuine issues of material fact preclude this Court from determining whether -- subject to the deeds of trust belonging to HSBC -- the property at issue rightfully belongs to plaintiffs or the Smiths. If the trier-of-fact were to determine that the Smiths knew they were assisting Charles in perpetrating fraud, or that the Smiths were unjustly enriched by their retention of the property, the imposition of a constructive trust on the property in plaintiffs' favor could be an appropriate remedy. See, e.g., Osin, 243 F.2d at 656 (explaining that "the acquisition of property through the fraudulent misrepresentation of a material fact has been held sufficient grounds to fasten a constructive trust on the property"); Hertz v. Klavan, 374 A.2d 871, 873 (D.C. 1977) (imposing a constructive trust

on property where nephew fraudulently induced his ninety-four-year-old aunt to sign a deed of sale conveying her property to the nephew); Bolle v. Hume, 619 A.2d 1192, 1196-97 (D.C. 1993) (explaining that a "constructive trust is an appropriate remedy for combatting [sic] unjust enrichment" and that "inequitable conduct . . . need not rise to [the] level of actual fraud" to justify the imposition of a constructive trust).

Whatever the nature of any constructive trust in favor of plaintiffs -- if such a trust were found warranted -- the alleged fraudulent transaction between plaintiffs and the Smiths could not give plaintiffs a claim to the property that is "superior to that of the trust holders who occupy the position of bona fide purchasers." Osin, 243 F.3d at 656. In other words, as between a seller who is the victim of a fraud and a subsequent bona fide purchaser like HSBC, the interests of the former "must yield to those who in good faith relied on the state of the record which [the former's] negligence allowed to exist." Id. Nevertheless, as between plaintiffs and the Smiths, it remains an open question whether the Smiths are entitled to a declaratory judgment that they possess title to the property unencumbered by any interest of plaintiffs.

## CONCLUSION

For the foregoing reasons, the Smiths' motion for summary judgment will be granted in part and denied in part, while the motion for summary judgment filed by HSBC and Ocwen will be granted in its entirety. As a result, plaintiffs' claims remaining in this case are Count 1 (fraud), Count 2 (violations of D.C. Code § 28-3904(r)), Count 8 (conversion of settlement funds), Count 10 (unjust enrichment), Count 13 (declaratory judgment) and Count 17 (quiet title); the Smiths' counter-claims for unjust enrichment and declaratory relief remain as well. A separate order has been posted on this date.

/s/ John D. Bates
JOHN D. BATES
United States District Judge

Dated: March 8, 2011